# 18-396

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

MATTHEW HERRICK,

*Plaintiff-Appellant,*

—against—

GRINDR LLC, KL GRINDR HOLDINGS INC.,
GRINDR HOLDING COMPANY,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## BRIEF FOR *AMICI CURIAE* COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, MATCH GROUP, INC., GLASSDOOR, INC., AND INDEED, INC. IN SUPPORT OF DEFENDANTS-APPELLEES

---

AMBIKA K. DORAN
ROBERT E. MILLER
  (*attorney admission forthcoming*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue
Seattle, Washington 98101
(206) 622-3150

JAMES ROSENFELD
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas,
  21st Floor
New York, New York 10020
(212) 489-8230

*Attorneys for Amici Curiae Computer & Communications
Industry Association, Match Group, Inc., Glassdoor, Inc., and Indeed, Inc.*

# TABLE OF CONTENTS

Page

**CORPORATE DISCLOSURE**............................................................................1

**STATEMENT OF INTEREST**..........................................................................1

**INTRODUCTION**.............................................................................................2

**ARGUMENT**....................................................................................................3

      A.     Courts Have Interpreted Section 230 Broadly to Fulfill Its Twin Goals of Encouraging Free Speech and Self-Policing Objectionable Content..........................................................................3

      B.     This Broad Immunity Has Resulted in the Proliferation of Content and Implementation of Measures to Deter Objectionable Content.......................................................................8

      C.     Reversing the District Court's Ruling Would Undo This Progress. .......................................................................................12

**CONCLUSION**.................................................................................................20

**CERTIFICATE OF COMPLIANCE**.............................................................22

**CERTIFICATE OF SERVICE**......................................................................23

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Almeida v. Amazon.com, Inc.*,
456 F.3d 1316 (11th Cir. 2006) ..........................................................................4

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) ...............................................................5, 6, 7

*Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*,
206 F.3d 980 (10th Cir. 2000) ...........................................................................4

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) ........................................................................4, 7

*Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
519 F.3d 666 (7th Cir. 2008) ...........................................................................4

*Doe v. Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016) ...................................................................17, 18

*Doe v. MySpace, Inc.*,
528 F.3d 413 (5th Cir. 2008) ...............................................................4, 7, 15

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) .......................................................................6, 18

*Fed. Trade Comm'n v. LeadClick Media, LLC*,
838 F.3d 158 (2d Cir. 2016) ..................................................................3, 4, 5

*Fields v. Twitter, Inc.*,
217 F. Supp. 3d 1116 (N.D. Cal. 2016), *aff'd*, 881 F.3d 739 (9th Cir. 2018) ..................................................................................................16

*Goddard v. Google, Inc.*,
No. 08-2738 JF (PVT), 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008) ...............................................................................................................19

*Green v. Am. Online*,
 318 F.3d 465 (3d Cir. 2003) .................................................................................4

*Herrick v. Grindr, LLC*,
 306 F. Supp. 3d 579 (S.D.N.Y. 2018) ...........................................13, 16, 17, 19

*Herrick v. Grindr, LLC*,
 No. 17-CV-932 (VEC), 2017 WL 744605 (S.D.N.Y. Feb. 24,
 2017) ......................................................................................................7, 17, 20

*Hill v. StubHub, Inc.*,
 727 S.E.2d 550 (N.C. Ct. App. 2012) ..................................................................5

*Johnson v. Arden*,
 614 F.3d 785 (8th Cir. 2010) ...............................................................................4

*Jones v. Dirty World Entm't Recordings LLC*,
 755 F.3d 398 (6th Cir. 2014) .............................................................4, 6, 18, 19

*Kimzey v. Yelp! Inc.*,
 836 F.3d 1263 (9th Cir. 2016) ...........................................................................16

*Klayman v. Zuckerberg*,
 753 F.3d 1354 (D.C. Cir. 2014) ...........................................................................4

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
 591 F.3d 250 (4th Cir. 2009) ...........................................................7, 16, 18, 19

*Reno v. ACLU*,
 521 U.S. 844 (1997)........................................................................................9, 14

*Ricci v. Teamsters Union Local 456*,
 781 F.3d 25 (2d Cir. 2015) ...................................................................4, 13, 19

*Stratton Oakmont, Inc. v. Prodigy Services Co.*,
 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ............................................5, 6

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
 478 F.3d 413 (1st Cir. 2007)...................................................................4, 13, 15

*Zeran v. Am. Online, Inc.*,
 129 F.3d 327 (4th Cir. 1997) .....................................................................*passim*

**Statutes**

17 U.S.C. § 512 ............................................................................................13

47 U.S.C. § 230(a)(3) ...................................................................................14

47 U.S.C. § 230(b)(2)(3) ...............................................................................5

47 U.S.C. § 230(c)(1) ..................................................................................3, 9

## CORPORATE DISCLOSURE

Pursuant to Federal Rule of Appellate Procedure 26.1, the Computer & Communications Industry Association ("CCIA") is an international nonprofit trade association of Internet and technology firms. CCIA has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

Match Group, Inc. is a publicly traded company. IAC/InterActiveCorp, a publicly held corporation, owns 10 percent or more of its stock.

Glassdoor, Inc. and Indeed, Inc. are wholly owned subsidiaries of RGF OHR USA, Inc., which is a wholly owned subsidiary of Recruit Holdings Co., Ltd., a public company traded on the Tokyo Stock Exchange.

## STATEMENT OF INTEREST[1]

CCIA represents over 20 companies that provide high technology products and services, including computer hardware and software, electronic commerce, telecommunications, and Internet products and services.[2] Glassdoor, Inc., Indeed, Inc., and subsidiaries of Match Group, Inc. operate Internet services that rely heavily on user-generated content. The protections provided by Section 230 of the Communications Decency Act, 47 U.S.C. § 230, are vital to Amici. Because a

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than Amici or their counsel made a monetary contribution to the brief's preparation or submission. Counsel for the parties have consented to the filing of this brief.

[2] A list of CCIA members is available at https://www.ccianet.org/members.

reversal of the District Court's decision would severely undermine these protections, Amici have a significant interest in the resolution of this appeal.

**INTRODUCTION**

Section 230 of the Communications Decency Act forbids imposing liability on online providers for content provided by users. For more than two decades, the statute has been a cornerstone for free speech protections on the Internet, with courts across the country, including the District Court here, recognizing and enforcing the broad immunity it provides in hundreds of cases.

Congress designed Section 230 to fulfill two primary goals: to promote speech and innovation on the Internet, and to encourage online providers to police their own services for objectionable content. The statute has been an unequivocal success. Hailed as the "law that gave us the modern Internet,"[3] Section 230 has permitted content to flourish, prompting the creation of countless online services and fueling the growth of some of the most powerful U.S. economic engines in the Internet age. Without Section 230 protections, these and other providers may suffer significant harm or cease to exist altogether, as the costs of litigation and potential liability from the astounding amount of user content would be crippling.

The statute has also accomplished Congress's second goal. The common law would have held online providers responsible if they undertook content

---

[3] Derek Khanna, *The Law that Gave us the Modern Internet—and the Campaign to Kill It*, THE ATLANTIC, Sept. 12, 2013.

moderation but failed to remove *all* unlawful content, creating an incentive for them to do no moderation at all. Section 230 superseded this rule, allowing service providers to take steps to identify and remove problematic content through various mechanisms such as automated tools and policies governing user conduct.

Recognizing this, the District Court rejected a claim premised entirely on a website's alleged failure to remove objectionable content. The court's thorough and well-reasoned opinion rejects many creative, but consistently unsuccessful, arguments to evade Section 230 immunity, and articulates core tenets of Section 230 that this Court should embrace. Amici urge this Court to affirm the statute's broad immunity and the District Court's decision recognizing it as such.

## ARGUMENT

### A. Courts Have Interpreted Section 230 Broadly to Fulfill Its Twin Goals of Encouraging Free Speech and Self-Policing Objectionable Content.

Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Thus, the law provides immunity where "the defendant (1) is a provider or user of an interactive computer service, (2) the claim is based on information provided by another information content provider, and (3) the claim would treat [the defendant] as the publisher or speaker of that information." *Fed. Trade Comm'n v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016) (internal quotation marks omitted).

Section 230(e)(3) contains an express preemption clause: "No cause of action may be brought and no liability imposed under any State or local law that is inconsistent with this section." Appellees have satisfied all three requirements here. Appellees' Br. (Dkt. 107) at 15-29.

Although this Court has had "limited opportunity to interpret Section 230," it has noted that "[o]ther circuits . . . have recognized that Section 230 immunity is broad." *LeadClick Media*, 838 F.3d at 173.[4] The same is true of state courts; as one court noted in 2012, when almost 300 reported decisions had interpreted Section 230, "[a]ll but a handful . . . [found] that the website is entitled to

---

[4] *See Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015) ("join[ing] consensus" that the term "interactive computer service" should be "construed broadly to effectuate the statute's speech-protective purpose"); *see also Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007); *Green v. Am. Online*, 318 F.3d 465, 471 (3d Cir. 2003); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997); *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) ("[c]ourts have construed the immunity provisions in § 230 broadly"); *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 406-07 (6th Cir. 2014); *Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008); *Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123-24 (9th Cir. 2003) (noting a "consensus" that "§ 230(c) provides broad immunity for publishing content provided primarily by third parties"); *Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*, 206 F.3d 980, 985 n.3 (10th Cir. 2000); *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) (internal quotation marks omitted) ("federal circuits have interpreted [Section 230] to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user"); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014).

immunity from liability." *Hill v. StubHub, Inc.*, 727 S.E.2d 550, 558 (N.C. Ct. App. 2012).

Congress designed Section 230 to serve two goals. First, it sought to "encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce." *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003); *see also LeadClick Media*, 838 F.3d at 173 ("Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium.") (internal quotation marks omitted); 47 U.S.C. § 230(b)(2)(3) (Section 230 is intended to "preserve the vibrant and competitive free market that presently exists for the Internet."). Second, it hoped to "encourage service providers to self-regulate the dissemination of offensive material over their services." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997); *see Batzel*, 333 F.3d at 1028.

Congress made these goals clear in overruling *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), a case holding online service Prodigy liable for defamatory comments posted by a user on one of its bulletin boards. *See* S. REP. NO. 104-230, at 194 (1996) (Conf. Rep.) (expressing intent to overrule *Stratton Oakmont* and "any other similar decisions"). Because Prodigy actively moderated and edited bulletin board messages in an attempt to prevent offensive content, the court applied common law publisher

principles, meaning that Prodigy could be liable for posts even if it did not know or have any reason to know they were defamatory. *Stratton Oakmont*, 1995 WL 323710, at *5; *see also Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) ("Section 230 marks a departure from the common-law rule that allocates liability to publishers or distributors of tortious material written or prepared by others.").

By overruling this result, Congress eliminated the "grim choice" the common law rule presented online service providers, i.e., those that voluntarily review content would be responsible for all posts, while "providers that bury their heads in the sand and ignore problematic posts altogether escape liability." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc); *see also Batzel*, 333 F.3d at 1029 ("If efforts to review and omit third-party defamatory, obscene or inappropriate material make a computer service provider or user liable for posted speech, then website operators and Internet service providers are likely to abandon efforts to eliminate such material from their site[s].") (citation omitted).

Section 230 recognizes the Internet's practical realities. "Interactive computer services have millions of users [and the] amount of information communicated . . . is . . . staggering." *Zeran*, 129 F.3d at 331. It is simply impossible for providers to review all of their user-generated content. *Id.* "Section

6

230 therefore sought to prevent lawsuits from shutting down websites and other services on the Internet," *Batzel*, 333 F.3d at 1028, and it did so by "bar[ring] state-law plaintiffs from holding interactive computer service providers legally responsible for information created and developed by third parties," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009). "The specter of tort liability in an area of such prolific speech would have an obvious chilling effect," because "[f]aced with potential liability for each message republished . . . providers might choose to severely restrict the number and type of messages posted." *Zeran*, 129 F.3d at 331.

To be sure, Congress recognized that some material posted on the Internet is harmful. But it made a choice that, while injured parties may sue the users who created the content, they may not sue the interactive computer service that enabled users to publish the content, including in circumstances similar to those here. *See, e.g.*, *Doe v. MySpace, Inc.*, 528 F.3d 413, 419 (5th Cir. 2008) (social networking site immune for claims premised on sexual assault resulting from online meeting); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003) (matchmaking website immune from claims stemming from fake profile that led to threats against the plaintiff, whom a user had impersonated); *see also Herrick v. Grindr, LLC*, No. 17-CV-932 (VEC), 2017 WL 744605, at *4 (S.D.N.Y. Feb. 24,

2017) ("The fact that [Grindr's] offerings have been weaponized by a particular Grindr user does not make Grindr the creator of the allegedly tortious content.").

**B.     This Broad Immunity Has Resulted in the Proliferation of Content and Implementation of Measures to Deter Objectionable Content.**

Section 230's broad immunity has served the statute's goals to ensure that regulation does not hamstring technological innovation or suppress online speech, while at the same time encouraging responsible online providers to take steps to prevent users from misusing their services.

Considered the backbone of Internet speech, Section 230 assures websites that they will not be responsible for content provided by their users, making possible successful online services and indeed "all of social media."[5]  "Without Section 230, it is difficult to conceive of social media, consumer review sites, and other user-focused online platforms existing in their current forms."[6]

As a consequence, "it is not a coincidence" that the most successful technology companies "are all U.S.-based," as Section 230 has promoted an

---

[5] Derek Khanna, *The Law that Gave us the Modern Internet—and the Campaign to Kill It*, THE ATLANTIC, Sept. 12, 2013, https://www.theatlantic.com/business/archive/2013/09/the-law-that-gave-us-the-modern-internet-and-the-campaign-to-kill-it/279588/; *see also* Note, *Section 230 as First Amendment Rule*, 131 HARV. L. REV. 2027 (2018) (opining on the effects of an Internet without Section 230 protections).
[6] Jeffrey Kosseff, *How do you change the most important law in Internet History? Carefully*, ARS TECHNICA (Dec. 23, 2017), https://arstechnica.com/tech-policy/2017/12/how-do-you-change-the-most-important-law-in-internet-history-carefully/.

innovation-friendly environment, just as Congress intended.[7] Immunity from liability associated with third-party content has been an essential component of the development and success of these and countless other companies because they "rel[y] in large part (or entirely) on content provided by their users, who number in the hundreds of millions, or billions." *Id.* "No sentence in the U.S. Code . . . has been responsible for the creation of more value than [Section 230(c)(1)]." *Id.*

In addition to promoting technical innovation, Section 230 has permitted a broad array of expression to thrive. As the Supreme Court put it, "the content on the Internet is as diverse as human thought." *Reno v. ACLU*, 521 U.S. 844 (1997). That is even truer today than in 1997. For example, millions of consumers rely on the reviews of their peers to make decisions about what to purchase and from whom. News often breaks and spreads by the modern-day version of "word-of-mouth"—the sharing of content online. The educational possibilities associated with user content—from user-created encyclopedias like Wikipedia to "do-it-yourself" videos on YouTube—are endless. As one journalist put it, the Internet is

---

[7] David Post, *A bit of Internet history, or how two members of Congress helped create a trillion or so dollars of value*, WASH. POST, Aug. 27, 2015, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/08/27/a-bit-of-internet-history-or-how-two-members-of-congress-helped-create-a-trillion-or-so-dollars-of-value/.

"a tool for bringing together the small contributions of millions of people and making them matter."[8]

Section 230 has also succeeded in accomplishing its second goal—by giving providers the incentive and freedom to police their own services for objectionable content. Online services devote countless resources to moderating content and protecting their users. In 2014, one expert estimated that "well over 100,000" content moderators were reviewing social media sites, apps, and cloud storage services.[9] The results are significant.

In the first three months of 2018 alone, Facebook took down 837 million items of spam, nearly all of which it found before any user reported it.[10] In that same period, Facebook disabled about 583 million fake accounts, most within minutes of registration. *Id.* Similarly, Twitter disabled nearly 1 million accounts

---

[8] Lev Grossman, *You—Yes, You—Are TIME's Person of the Year*, TIME MAGAZINE, Dec. 25, 2006; *see also* Noah Tischler, *Free Speech Under Siege: Why the Vitality of Modern Free Speech Hinges on the Survival of Section 230 of the Communications Decency Act*, 24 TEMP. POL. & CIV. RTS. L. REV. 277, 278 (2014) (Section 230 "is considered equally important as the First Amendment with respect to online free speech.").

[9] Brent Skorup, *Target Criminals Online, not Tech Companies Caught in the Middle*, PLAIN TEXT (Aug. 25, 2017), https://readplaintext.com/target-criminals-online-not-tech-companies-caught-in-the-middle-6404a0d2d0af.

[10] Facebook Newsroom, *Facebook Publishes Enforcement Numbers for the First Time* (May 15, 2018), https://newsroom.fb.com/news/2018/05/enforcement-numbers/.

for promotion of terrorism from August 1, 2015 through June 30, 2017.[11]  In the

first half of 2016, Twitter suspended 299,649 accounts.  *Id.*  Of those suspensions,

95 percent resulted from the service's internal efforts to combat this content with

proprietary tools, and 75 percent occurred before the account had posted at all.  *Id.*

More generally, online providers increasingly implement measures that have

become commonplace, such as providing links, e-mail addresses, flagging and

"report abuse" buttons, and other mechanisms for users to report particular

content[12]; specifying and enforcing "community guidelines," terms of service, and

other rules and standards for users[13]; using technology to detect and remove or

---

[11] Twitter Public Policy, *New Data, New Insights: Twitter's Latest #Transparency Report* (Sept. 19, 2017),
https://blog.twitter.com/official/en_us/topics/company/2017/New-Data-Insights-Twitters-Latest-Transparency-Report.html.
[12] *See, e.g.*, Pinterest, *Report something on Pinterest*,
https://help.pinterest.com/en/articles/report-something-pinterest#Web (each post has "Report Pin" button and Pinterest provides contact links); Amazon, *Community Guidelines*,
https://www.amazon.com/gp/help/customer/display.html?nodeId=201929730 (how to report abuse for content such as customer reviews and customer answers to questions); Facebook, *Report a Violation*,
https://www.facebook.com/help/263149623790594/ (how to report abuse).
[13] *See, e.g.*, Google+, *User Content and Conduct Policy*,
https://www.google.com/+/policy/content.html (prohibiting hate speech, harassment, bullying, and threats, among other conduct); Amazon, *Community Guidelines*,
https://www.amazon.com/gp/help/customer/display.html?nodeId=201929730 (prohibiting users from posting content that is defamatory, harassing, threatening, or inflammatory); Foursquare, *Acceptable Use Policy*,
https://foursquare.com/legal/use (prohibiting users from posting anything "unlawful, threating, abusive, harassing, [or] defamatory," among other things).

block particular kinds of content, such as child pornography; moderating message boards, chat rooms, and other spaces for user content; responding to complaints; and removing third-party content for violations of law or the service's own rules.[14]

Section 230 is working as Congress intended: online providers are not only responsible for the explosion of online content, but have taken proactive steps to identify and remove objectionable content. The District Court's decision, which adopts the same broad reading as courts nationwide, recognizes this.

## C.      Reversing the District Court's Ruling Would Undo This Progress.

Herrick and his supporting amici make numerous arguments to avoid Section 230 immunity—all of which courts have resoundingly rejected, as the District Court did here. To avoid duplicating Appellees' brief, Amici focus on three arguments here.

*Notice-based liability.* Herrick asks this Court to interpret Section 230 to permit liability where a provider has received notice of allegedly unlawful content. Appellant's Br. (Dkt. 53) at 7; *see also, e.g.*, Consumer Watchdog Br. (Dkt. 68) at 25 (Section 230 does not apply if a provider is "aware of the tortious or criminal conduct" and "takes no action"); Sanctuary for Families Br. (Dkt. 62) at 20

---

[14] *See, e.g.*, eBay, *Seller performance and feedback policy*, https://www.ebay.com/help/policies/selling-policies/seller-performance-policy/seller-performance-defect-removal-policy?id=4352 (describing when eBay may remove feedback left by users).

("Grindr was on clear notice that Herrick was being abused . . . ."). But Congress chose not to create such a scheme. *Supra* at 1.A.

Accordingly, this Court has already held that notice alone does not strip a provider of immunity. In *Ricci v. Teamsters Union Local 456*, 781 F.3d 25 (2d Cir. 2015), the court rejected a claim that a defendant domain name registrar "'refused to remove' from its web servers an allegedly defamatory newsletter that was authored by another," as Section 230 "shields [the registrar] from publisher liability (with respect to web content provided by others) in its capacity as a provider of an interactive computer service." *Id.* at 28. The District Court followed this precedent, rejecting Herrick's argument that "there is an exception to Section 230(c)—or at least 'heightened accountability'—when an [interactive computer service] is on notice that its service is being used to commit a crime or sexual violence." *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 592 (S.D.N.Y. 2018); *see also Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 420 (1st Cir. 2007) ("It is, by now, well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech."); *Zeran*, 129 F.3d at 333.

This is the right result. Congress did not impose a notice-and-takedown regime in Section 230, as it could have done—and as it did in the copyright context. *See* 17 U.S.C. § 512. Instead, it recognized that such a regime would

have a chilling effect on speech, contrary to its goal to preserve the Internet as "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230(a)(3). Notice of potentially unlawful content would require "a legal judgment . . . and an on-the-spot editorial decision whether to risk liability by allowing the continued publication of that information," giving providers a "natural incentive simply to remove messages upon notification, whether the contents were [unlawful] or not." *Zeran*, 129 F.3d at 333. To the extent amici suggest only "Bad Samaritans," EPIC Br. (Dkt. 72) at 20, who ignore "clear notice," Sanctuary for Families Br. at 20, should be liable, such subjective standards offer little comfort. The predictability provided by Section 230 would crumble, stifling Congress's goal to promote both speech and innovation. Online providers would have no choice but to remove any content for which they receive any objection. The resulting "heckler's veto" would give anyone who complains unfettered power to censor speech. *See Reno v. ACLU*, 521 U.S. at 880.

Nor is notice-based liability necessary to serve Congress's goal of encouraging online providers to moderate user content. As Herrick and his supporting amici admit, "other dating apps are responsive to user complaints and take measures to swiftly act if a user is being injured by their products," even though the operators of those apps do not face liability for inaction, Appellant's Br.

at 15; technology "can also provide the most effective solutions to prevent" "dating abuse and harassment," Break the Cycle Br. (Dkt. 70) at 17-18 (internal quotation marks omitted); and providers, including social media companies and dating apps, have "developed polices designed to prevent abuse on their platforms and to help victims of such abuse," *id. See also* Sanctuary for Families Br. at 20-21 (providing more examples). Thus, if Herrick and these amici are right, providers devote significant effort to policing abusive content on their services—just as Congress intended.

***Content versus conduct.*** Herrick and his supporting amici also attempt to draw a distinction between a provider's "conduct" and third-party "content." That argument is not new; courts have consistently rejected it and other creative attempts to circumvent Section 230's broad immunity. *E.g.*, *MySpace*, 528 F.3d at 419-20 (rejecting as "artful pleading" plaintiff's assertions that her claims did not treat MySpace as a publisher because the claims fundamentally were "directed toward MySpace in its publishing, editorial, and/or screening capacities").

For example, the plaintiff in *Universal Communications Systems, Inc. v. Lycos, Inc.*, argued Section 230 immunizes only "traditional editorial functions," not "decisions regarding the 'construct and operation' of [] web sites." 478 F.3d at 422. But as the First Circuit recognized, this "misapprehends the scope of Section 230 immunity," which "applies not only for the service provider's decisions with

15

respect to that posting, but also for its inherent decisions about how to treat postings generally." *Id.*; *see also Nemet Chevrolet*, 591 F.3d at 257 (rejecting claim that "structure and design of website" can give rise to liability because website did not require illegal content as condition of use); *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016) (Section 230 barred claims attacking Twitter's "decisions to structure and operate itself as a platform . . . allow[ing] for the freedom of expression [of] hundreds of millions of people around the world"), *aff'd*, 881 F.3d 739 (9th Cir. 2018). Courts have cautioned against attempts like Herrick's to "artful[ly] skirt[] the CDA's safe harbor provision," as "the CDA and its purpose of promoting the 'free exchange of information and ideas over the Internet' [cannot] be so casually eviscerated." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266, 1269 (9th Cir. 2016).

The District Court saw through Herrick's attempts to "artfully skirt" Section 230, concluding that attacks on the design and construct of Grindr seek to hold Grindr liable as the publisher or speaker of the allegedly unlawful profiles. *See* 306 F. Supp. 3d at 590. Grindr's allegedly faulty design and alleged lack of safety features are "only relevant to Herrick's injury because they bear on Grindr's ability to search for and remove content posted to the app—exactly the sort of 'editorial choices' that are a function of being a publisher." *Id.* at 591. As the court put it, "[t]he CDA applies at both the individual and systemic or architectural level." *Id.*

16

at 592; *see also Herrick*, 2017 WL 744605, at *3 ("The fact that an ICS contributed to the production or presentation of content is not enough to defeat CDA immunity.").

Relying on *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 852 (9th Cir. 2016), amicus Break the Cycle claims this case has "nothing to do with [] efforts, or lack thereof, to edit, monitor, or remove user generated content." Break the Cycle Br. 27. *Internet Brands* is entirely distinguishable. There, the Ninth Circuit held that Section 230 did not provide immunity to the operator of a model networking website for claims based on the assault of an aspiring model lured by two men who saw her profile on the website, where the two men did not post any content on the site and the plaintiff alleged the website knew about the scheme, but not because of its activities overseeing the website. 824 F.3d at 851. As the District Court held, "*Internet Brands* is best read as holding that the CDA does not immunize an ICS from a failure to warn claim when the alleged duty to warn arises from something other than user-generated content." *Herrick*, 306 F. Supp. 3d at 592.

The plaintiff in *Internet Brands* did not complain about or seek removal of any user-generated content, while Herrick's allegations revolve entirely around content generated by a third party on the Grindr app. *See* Appellant's Br. at 7 ("Matthew didn't plan any of this. His stalker ex-boyfriend did, by impersonating him on the Grindr App."); *Herrick*, 306 F. Supp. 3d at 586 (amended complaint

17

"doubl[es] down on [Herrick's] theory that Grindr is responsible for the impersonating profiles"). In fact, the *Internet Brands* court distinguished a case where "the CDA barred a negligent undertaking claim against a website that failed to remove an offensive profile posted on the website by the victim's ex-boyfriend." 824 F.3d at 851 (citing *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101-03 (9th Cir. 2009)). The statute likewise bars the claims here.

***Dismissal on the pleadings.*** Herrick and his supporting amici argue that the District Court should have permitted him to seek discovery or amend his complaint. *See* Break the Cycle Br. at 20-21; Appellant's Br. at 18-21. Doing so, however, would diverge sharply from prevailing law and undermine a core purpose of Section 230, which is to provide "*an immunity from suit* rather than a mere defense to liability and it is effectively lost if a case is erroneously permitted to go to trial." *Nemet Chevrolet*, 591 F.3d at 254 (emphasis in original) (internal quotation marks omitted); *see also, e.g.*, *Roommates.com*, 521 F.3d at 1175 (Section 230 "must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles"); *Jones*, 755 F.3d at 417 n.4 (admonishing district court for allowing case to proceed to trial and failing to certify interlocutory appeal of Section 230 rulings).

The need to apply Section 230 early in litigation arises from "the 'obvious chilling effect' the 'specter of tort liability' would otherwise pose to interactive

computer service providers given the 'prolific' nature of speech on the internet." *Nemet Chevrolet*, 591 F.3d at 254 (quoting *Zeran*, 129 F.3d at 331). As the Sixth Circuit recognized, early resolution protects "the role that the CDA plays in an open and robust internet by preventing the speech-chilling threat of the heckler's veto." *Jones*, 755 F.3d at 417.

Permitting further amendment or discovery here would—aside from being futile—poses such a threat. As this Court has recognized, a motion to dismiss on Section 230 grounds is appropriate where "the statute's barrier to suit is evident from the face of the complaint." *Ricci*, 781 F.3d at 28. That is precisely the case here: No amount of artful pleading can change that Herrick's complaint seeks to hold Grindr responsible for content generated by a user. *See Herrick*, 306 F. Supp. 3d at 588 ("To the extent Herrick has identified a defect in Grindr's design or manufacture or a failure to warn, it is inextricably related to Grindr's role in editing or removing offensive content . . . ."). "[C]ourts repeatedly have rejected attempts to re-characterize claims" to "avoid § 230's bar on treat[ing] [a website] as a 'publisher.'" *Goddard v. Google, Inc.*, No. 08-2738 JF (PVT), 2008 WL 5245490, at *4 (N.D. Cal. Dec. 17, 2008) (internal quotation marks omitted). Herrick provides no facts that could take his complaint outside the scope of Section 230.

Herrick's suggestion that discovery could change this result is equally unfounded, and would open the door to meritless fishing expeditions. The use of

19

jargon like "code functionality" and "server-side software" does not alter the fact that the complaint seeks to impose liability on Grindr for hosting third-party content—for which it is immune. Appellant's Br. at 31-32. Regardless of whether Grindr took measures such as "[o]btaining ICC numbers, MAC addresses, utilizing VPN blocking and geofencing," *id.* at 31, Herrick's claims arise from user content. *See* 2017 WL 744605, at *4 n.7 ("While the Court gives Plaintiff credit for his creativity in formulating this argument, his claim rests, at bottom, on the tortious nature of the content that [the user] created and posted."). The type of discovery Herrick suggests would impose litigation costs Section 230 was designed to deter.

## CONCLUSION

For these reasons, Amici respectfully urge the Court to affirm the District Court's decision regarding Section 230 immunity.

Dated: August 30, 2018

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By */s/Ambika K. Doran*

Ambika K. Doran
Robert E. Miller (attorney admission application forthcoming)

1201 Third Avenue, Suite 2200
Seattle, WA 98101
(206) 757-8030
ambikadoran@dwt.com

20

James Rosenfeld
1251 Avenue of the Americas
21st Floor
New York, New York 10020-1104
(212) 489-8230
jimrosenfeld@dwt.com

*Attorneys for Amici Curiae Computer &
Communications Industry Association,
Glassdoor, Inc., Indeed, Inc., and Match
Group, Inc.*

21

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because it is no more than one-half the maximum length authorized for the principal brief.

I further certify that the attached amicus curiae brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 14-point Times New Roman font.

Executed this 30th day of August, 2018.

*/s/Ambika K. Doran*
Ambika K. Doran

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on August 30, 2018.

I certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 30th day of August, 2018.

*/s/Ambika K. Doran*
Ambika K. Doran